**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

KAREN E. MURAWSKI,      )
      Plaintiff,          )
                             )     Case No. 3:11-cv-0208
v.                          )     Judge Nixon/Brown
                             )
MICHAEL J. ASTRUE,      )
Commissioner of Social Security,  )
      Defendant.        )

To:    The Honorable John Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB), as provided under Title XVI and Title II of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Administrative Record and supporting memorandum. (Docket Entries 12, 12-1). In turn, the Commissioner responded and Plaintiff filed a reply. (Docket Entries 15, 16). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 10). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED**.

## I. INTRODUCTION

Plaintiff protectively filed applications for DIB and SSI on September 19, 2006, alleging disability since August 17, 2006. (Tr. 18). The Commissioner denied both applications initially

1

on April 9, 2007, and upon reconsideration on May 11, 2007. *Id.* Upon Plaintiff's timely

request, a hearing before administrative law judge ("ALJ") Phylis M. Pierce was held on April

14, 2009. (Tr. 27-40). The ALJ issued an unfavorable decision on May 29, 2009. (Tr. 15-26).

In her decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since August 17,2006, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.).*

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine with a history of back surgery in 2001, lupus, and fibromyalgia (20 CFR  404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 28, 1961, and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

2

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 17,2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

On January 5, 2011, the Appeals Council denied Plaintiff's request for review. (Tr. 1-5). Plaintiff filed the pending action on June 10, 2011. (Docket Entries 12, 12-1).

## II. REVIEW OF THE RECORD

Plaintiff was born on April 28, 1961, making her 47 years old when the ALJ issued her decision. (Tr. 31). She received schooling until the eleventh grade and did not graduate. *Id.* Plaintiff worked for Kroger from May 1980 until she left on the alleged onset date of August 17, 2006. (Docket Entry 12, p. 3; Tr. 31). Plaintiff has not worked since that date. (Tr. 31).

Plaintiff's health problems described in the record date back to 2001, when she had back surgery on her lumbar spine to repair a bulging disc. (Tr. 20-21, 265). Since then, Plaintiff saw two treating physicians: her primary care doctor, Dr. Anthony Dallas, Jr., and her rheumatologist, Dr. Michael Watterson.

Per records from Family Health Care of Hendersonville, PLLC, Plaintiff first saw Dr. Dallas in March 2002 and made visits through August 2006.[1] (Tr. 214). In 2003, Plaintiff visited Dr. Dallas on six occasions and primarily complained of gastroesophageal reflux disease, abdominal pain, pelvic pain, migraine headaches, dizziness and fatigue. (Tr. 209-13). After September 2003, Plaintiff did not see Dr. Dallas again until October 2004. On October 11, 2004, Plaintiff was treated for an acute upper respiratory infection and, on October 28, 2004, she was

---

[1]The 2002 visit seems to have been overlooked by the ALJ, the Commissioner, and the Exhibits List in the Administrative Record. While the Exhibits List states that Plaintiff first saw Dr. Dallas in 2003, a closer reading of the last page of Exhibit 4F indicates that Plaintiff visited Dr. Dallas on March 21, 2002. (Tr. 214) The Magistrate Judge notes that Plaintiff's counsel already pointed out this error. (Docket Entry 12-1, p. 5-6).

3

treated for a yeast infection. (Tr. 208, 206). In 2005, Plaintiff returned to Family Health Care of Hendersonville on six more occasions, complaining of cough, fever, sore throat, ear and body aches, headaches, sinus pressure, dizzy spells, tongue pain and fatigue.[2] (Tr. 200-05).

On August 29, 2006, Dr. Dallas visited with Plaintiff and diagnosed her with fibromyalgia lupus. The same day, Dr. Dallas filled out a disability certificate showing that Plaintiff is totally and permanently disabled and her condition will continue for a long and indefinite period or death. (Tr. 192). Dr. Dallas opined that the disability commenced as of January 2003. The last time Dr. Dallas is mentioned in the record is June 27, 2007, when he completed a Medical Source Statement of Ability to Do Work-Related Activities regarding Plaintiff. (Tr. 282-85). Dr. Dallas found that Plaintiff had a number of limitations due to her arthritis, myopathy and fibromyalgia. As for Plaintiff's exertional limitations, she could lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk less than 2 hours in an 8-hour workday; sit only if periodically alternating between sitting and standing; and push and/or pull with limitation in both upper and lower extremities. As for postural limitations, Plaintiff could occasionally perform balancing activities–but could never perform climbing, kneeling, crouching, crawling or stooping. (Tr. 283). As for manipulative limitations, Plaintiff's feeling was unimpaired–but she occasionally was limited in reaching, handling and fingering. (Tr. 284). Dr. Dallas did not find Plaintiff to have visual/communicative limitations or environmental limitations. (Tr. 284-85).

The record does not contain evidence regarding Dr. Watterson until his progress notes

---

[2]Note that, during some of these 2005 visits, it is not clear whether Plaintiff saw Dr. Dallas. The medical records seem to indicate the signatures or initials from other physicians at Family Health Care of Hendersonville.

4

entered on October 20, 2005.[3]  (Tr. 182).  Dr. Watterson, a rheumatologist at Arthritis Specialists

of Nashville, added progress notes for Plaintiff on six dates between 2005 and 2006.  (Tr. 179-

82).  Plaintiff was diagnosed with fibromyalgia and myofascial tendonitis.  She had trouble

sleeping, headaches, pain in her feet, legs, back and arms, and swelling of her fingers, hands and

knees.  *Id*.  A medication flow chart shows that Plaintiff was taking ten medications by June 15,

2006.  (Tr. 183).  Dr. Watterson ordered a series of tests that Plaintiff underwent in June 2006:

CT Scan results were normal; Urinalysis results were normal; TSH results were low; CRP results

were high; ESR results were above the normal range; Results were positive (abnormal) for Anti-

Nuclear AB, ANA Titer, ANA Pattern, Anti-RNP AB and RNP AB-EIA; and an abnormal

mitochondrial staining pattern was observed.  (Tr. 183-90).

On August 9, 2006, Dr. Watterson visited with Plaintiff and diagnosed her with auto-

immune disorder.  The same day, Dr. Watterson filled out a disability certificate showing that

Plaintiff is totally and that permanently disabled and her condition will continue for a long and

indefinite period or death.  (Tr. 192).  Dr. Watterson opined that the disability commenced as of

January 2003.  The last time Dr. Watterson appears in mentioned in the record is May 11, 2007,

when he completed a Medical Source Statement of Ability to Do Work-Related Activities

regarding Plaintiff.  (Tr. 286-89).  Most of Dr. Watterson's findings are exactly the same results

Dr. Dallas recorded a few months later in August 2007.  (*See* Tr. 282-85).  That is, Dr. Watterson

found that Plaintiff had a number of limitations due to her myopathy (muscle disease) and

arthritis.  As for Plaintiff's exertional limitations, she could lift and/or carry 10 pounds

---

[3]The Magistrate Judge notes that the lack of evidence relating to Dr. Watterson is at odds
with Plaintiff's testimony that she had been seeing him since 2002 or 2003.  (Tr. 33).  The ALJ
correctly points out, however, that "based on the medical evidence of record there is no evidence
of medical treatment from Dr. Watterson prior to 2005[.]" (Tr. 23).

5

occasionally and less than 10 pounds frequently; stand and/or walk less than 2 hours in an 8-hour workday; sit only if periodically alternating between sitting and standing; and push and/or pull with limitation in both upper and lower extremities. (Tr. 286-87). As for postural limitations, Plaintiff could occasionally perform balancing activities–but could never perform climbing, kneeling, crouching, crawling or stooping. (Tr. 287). As for manipulative limitations, Plaintiff's feeling was unimpaired–but she occasionally was limited in reaching, handling and fingering. (Tr. 288). Dr. Watterson did not find Plaintiff to have visual/communicative limitations or environmental limitations. (Tr. 288-89).

The record contains evidence related to Hendersonville Medical Center, from November 2005 to September 2006. (Tr. 215-44). Plaintiff presented to the Emergency Room ("ER") on November 14, 2005 and was treated for pneumonia-like symptoms. (Tr. 217-18). Her past medical and social history listed asthma, fibromyalgia, rheumatoid arthritis and tobacco abuse. (Tr. 217). Dr. Duane E. Harrison treated Plaintiff and noted his impression of "[c]hest pain and shortness of breath secondary to right lower lobe pneumonia." *Id*. Plaintiff returned to the ER on January 19, 2006, with complaints of migraine headaches. (Tr. 225-26). Dr. Jospeh Magoun ordered a computerized tomography exam of Plaintiff's head, the results of which were "normal." (Tr. 227). Plaintiff was assessed with "acute cephalgia" and given Demerol, Phenergan, Nubain and Benadryl. (Tr. 225). Another ER visit occurred on June 8, 2006, when Plaintiff presented with pain in her back and right breast. (Tr.228-29). Dr. Arthur Williams, II noted Plaintiff's past medical history of asthma, rheumatoid arthritis, fibromyalgia and migraine headaches. Dr. Williams' final impression included right breast pain and fibrocystic breast tissue. He also explained to Plaintiff that, because of her fibromyalgia in the breast, she might experience more

6

pain in her back. (Tr. 228-29). Plaintiff's last recorded visit to the Hendersonville Medical

Center ER was July 24, 2006. (Tr. 230-31). After apparently being dizzy and confused at work,

Plaintiff was brought the ER by co-workers at Kroger. Other symptoms included chest pain,

nausea, diarrhea and a dry cough. The ER report also notes that Plaintiff was "[a]pparently

diagnosed with lupus approximately three weeks ago." (Tr. 230). After numerous lab tests

yielded normal results, Plaintiff was given Valium and was discharged and referred to a

neurologist.[4] (Tr. 230-39).

    The records from Hendersonville Medical Center also include exam results dated

September 22, 2006. (Tr. 240-43). An MRI of Plaintiff's brain yielded "normal" results, except

for an "abnormal signal [that] most likely represents small focus of chronic ischemia glicosis

secondary to small vessel disease versus sequela from prior migraine." (Tr. 240). A second MRI

of the lumbar spine yielded an impression of "slight retrolisthesis of L1 on L2 with diffuse disc

bulging. This produces bilateral neural foraminal narrowing, right greater than left and some

mass-effect on the anterior thecal sac." (Tr. 242). Additional impressions included "disc space

narrowing and diffuse disc bulging . . . Moderate bilateral neural foraminal narrowing . . . [and]

slight wedging of L1 with a Schmorl's node[.]" (Tr. 243).

    Dr. James P. Anderson is listed as Plaintiff's physician on the September 2006 exam

results from Hendersonville Medical Center. (Tr. 251-53). The record indicates that Plaintiff

first saw Dr. Anderson, a neurologist at Affiliated Neurologists, PLC, in June 2001. (Tr. 261-

63). On June 5, 2001, Plaintiff presented to Dr. Anderson with bilateral leg pain and

---

    [4]Specifically, the ER report stated: "CMP is normal. Troponin and myoglobin are normal. PT and PTT are normal. Chest x-ray normal. CBC normal. D-dimer negative. UA is normal. Urine drug screen positive for opiates but that would confirm the patient's use of Lortab. CT of the head without contrast shows no abnormality[.]" (Tr. 231-32).

7

paresthesias. Dr. Anderson's clinical interpretation was stated: "Borderline to mild dorsal medial lemniscal pathway prolongation bilaterally. There is no evidence of peripheral conduction slowing." (Tr. 261). On July 27, 2006, Dr. Anderson's progress notes include Plaintiff's complaints of weakness, dizziness and facial numbness. (Tr. 250). The next month, Plaintiff underwent a 72 Hour EEG and a series of electrodiagnostic tests. (Tr. 255-58). On August 18, 2006, Dr. Anderson noted a "normal 72 hour ambulatory EEG recoding during wakefulness, drowsy and sleep." (Tr. 255). On August 25, 2008, Dr. Anderson concluded that results of Plaintiff's NCS/EMG of the right and left legs were essentially normal. There was no evidence of a focal compressive neuropathy, a generalized peripheral neuropathy, or an active lumbosacral radiculopathy. (Tr. 258). The record's last evidence related to Dr. Anderson are progress notes from September and October 2006, when Plaintiff complained of migraines and general pain that was not helped by nerve blocks. (Tr. 248-29).

On January 29, 2007, Plaintiff underwent physical examination by Dr. Albert Gomez, who provided a consultative report as requested by the Tennessee Division of Disability Determinations. (Tr. 265-69). Plaintiff complained of fibromyalgia, lupus, arthritis, chronic pain in multiple muscles and joints, chronic headaches since age five and multiple seizures within the previous year. (Tr. 27). It was noted that Plaintiff's pain symptoms were decreased with pain medication and rest. *Id*. Further, Plaintiff stated that she had approximately 20 seizures in the year before her examination and that she last seizure was one month earlier. She claimed to be taking Topamax for the seizures. *Id*. Dr. Gomez noted that Plaintiff was married, finished the 11th grade, and, as of the exam date, was on sick leave from her job as a meat cutter at Kroger's. It was also noted that Plaintiff smokes a pack of cigarettes a day–which has been a habit for 30

8

years.  (Tr. 266).

Upon Dr. Gomez's physical examination of Plaintiff, he noted she was obese, walked with a limp without assistance from walking devices, and had moderate difficulty getting on and off the exam table.  (Tr. 266).  Dr. Gomez also noted that Plaintiff was alert and oriented, and appeared to be in no acute distress.  *Id.*  As for her neck, there was moderate tenderness; flexion showed 40 degrees and extension showed 50 degrees.  The right and left lateral flexion showed 35 degrees and rotation for both showed 65 degrees.  (Tr. 267).  As for her extremities, Plaintiff's right shoulder had full range of motion except for abduction of 100 degrees; and her left shoulder had full range of motion except for abduction of 100 degrees and forward elevation of 115 degrees.  Plaintiff's wrists both showed palmar flexion decreased to 50 degrees.  Otherwise, Plaintiff's wrists, elbows, fine finger movements and extension, fist making and pinch grip were all normal.  The Tinel's sign was negative bilaterally and the Phalen's sign was positive bilaterally.  *Id.*

Dr. Gomez noted moderate tenderness in both Plaintiff's hips and knees.  Plaintiff's right and left hips both had a full range of motion except for flexion of 90 degrees and abduction of 30 degrees.  Both knees showed flexion of 110 degrees with normal extension.  *Id.*  As for her ankles, both showed full range of motion and had moderate tenderness.  (Tr. 268).  Plaintiff's feet had moderate tenderness to palpation without edema and her hand grip was 4/5 bilaterally.  For both her upper and lower extremities, motor strength showed 4/5 bilaterally and tendon reflexes 2+ bilaterally.  Straight leg raising tests were positive bilaterally at 45 degrees in the lying position and positive bilaterally in the sitting position.  *Id.*  Plaintiff's back showed moderate tenderness, flexion of 60 degrees, extension of 15 degrees, and right and left lateral flexion of 20

9

degrees.  *Id*.

Plaintiff's neurological and musculoskeletal systems were also examined by Dr. Gomez. As to the former, there were no focal findings; the Baninski sign was absent and Romerg test was negative.  Plaintiff had normal results for her finger-to-nose test, tandem walk, heel walk and toe walk–but her heel-to-shin test was done "awkwardly bilaterally."  While Plaintiff could not squat, she stood on one leg normally.  *Id*.  As for Plaintiff's musculoskeletal systems, there was moderate tenderness in her arms and legs.  Further, "[t]here were trigger points palpated, moderate but not severe tenderness to palpation along both deltoid areas, supraspinatus, paraspinal areas, supra gluteal areas, trochanter and medial knees.  (Tr. 268).

Based on his findings, Dr. Gomez provided a medical assessment of ability to do work-related activities.  He stated that Plaintiff "can occasionally lift 20 pounds in an eight hour work day . . . [and] could stand to sit at least six hours in an eight hour work day with normal breaks." (Tr. 268).  Dr. Gomez also listed seven of his impressions: "Fibromyalgia according to the patient[;] Systemic lupus erythematosus according to the patient[;] Carpal tunnel syndrome[;] Degenerative joint disease[;] Obesity[;] Chronic headaches [and] Seizures according to the patient."  (Tr. 268-69).

On April 9, 2007, Dr. James Moore, the SSA's reviewing physician, completed a Physical RFC Assessment regarding the Plaintiff.  (Tr. 270-77).  Plaintiff's primary diagnosis is listed as generalized arthralgias; her secondary diagnosis is listed as migraines; and "other alleged impairments" are lupus, asthma, and obesity.  (Tr. 270).  As for "exertional limitations," Dr. Moore opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit (with normal breaks) about 6 hours in an 8-hour workday;

and otherwise had unlimited ability to push and/or pull. (Tr. 271). Dr. Moore also opined that Plaintiff had multiple "postural limitations," as she was frequently limited with climbing; balancing; stooping; kneeling; crouching and crawling. (Tr. 272). That said, Dr. Moore's assessment did not establish any manipulative; visual; communicative; or environmental limitations. (Tr. 273-74). Dr. Moore confirmed that his findings about Plaintiff's physical limitations or restrictions were not significantly different from Dr. Gomez's conclusions. (Tr. 276).

At her administrative hearing, Plaintiff testified that she is 47 years old and that she went as far as the 11th grade in her schooling. (Tr. 31). While she could not remember the exact date, Plaintiff estimated that she worked at Kroger from 1980 until she "recently left." She worked in the deli department from 1980 until 1997 and then the meat department for the remainder of her employment. *Id.* Plaintiff testified that, as a deli worker, she lifted over 20 pounds but not over 50 pounds. As an employee in the meat department, Plaintiff testified that she lifted over 50 pounds but not over 100 pounds. *Id.*

Plaintiff testified that she has not worked since her alleged onset date of August 17, 2006. (Tr. 32). She testified that her earnings from Kroger in the fourth quarter of 2006 and 2007 were related to "disability pay." She described the situation as "where you get a sick leave and then they pay you, I think up to six months." *Id.*

When asked to list her medical conditions, Plaintiff noted arthritis, fibromyalgia and lupus. *Id.* Plaintiff testified that she underwent back surgery in 2001 and continues to have "a lot of back problems." (Tr. 32-33). Specifically, Plaintiff explained that her back causes "excruciating pain" and that it "kills her" to bend over and she cannot "straighten up." (Tr. 33).

11

For her back pain, Plaintiff stated that she takes Lortab four times a day; Soma three times a day; Plaquenil twice a day; Naproxen twice a day; and Tylenol when needed. *Id.*

Dr. Watterson is the person who Plaintiff says prescribes the pain medications. *Id.* When asked how long she has been seeing Dr. Watterson, Plaintiff answered, "I think since 2002 or 2003. I'm not really sure." *Id.* Plaintiff did confirm that she sees Dr. Watterson "anywhere from three to four weeks." (Tr. 34). Plaintiff testified that Dr. Watterson diagnosed her with fibromyalfia and lupus, although she is not certain of the exact date. *Id.*

Plaintiff lives in a household with her husband, daughter and her daughter's boyfriend, and two grandchildren. *Id.* Plaintiff stated that her husband is currently "out of a job" and has been "out of work since last July." (Tr. 35).

When asked to describe her activities on a typical day, Plaintiff stated: "Normally, I'll try to do some work around the house. I cook dinner. That's basically about it." *Id.* Plaintiff confirmed that she is able to take care of personal needs, such as bathing and dressing. When specifically asked about laundry, Plaintiff said she puts the clothes in the washer–but her daughter takes them out because she "can't bend down to get it out of the dryer." *Id.* Plaintiff has not been able to do yard work for "quite [a] few years." *Id.*

Plaintiff claims she does not really have any hobbies and that she "hardly ever" drives. *Id.* Plaintiff estimates that she drives about three times a week and her daughter usually does the shopping. *Id.* Plaintiff testified that she is not involved in any social activities and mostly just stays at home. She claims, "I have literally become a hermit." (Tr. 26).

Plaintiff cited problems standing and walking–and estimated she can stand/walk "about 15 minutes, 20 minutes maybe." *Id.* Plaintiff estimated that she can lift "probably 15 pounds."

12

*Id.* She claimed that sitting bothers her and she can only sit without standing for about 15-20 minutes. (Tr. 36-37).

Plaintiff's attorney asked her questions at the hearing as well. (Tr. 37-39). When asked about her difficulty using her hands due to arthritis, Plaintiff said she has "a hard time" opening and grasping tings like cans, bottles and jars. (Tr. 37). Further, Plaintiff testified that she can only write "for a few minutes and then it starts to cramp in my fingers." *Id.*

When her attorney asked about difficulty with stairs, Plaintiff stated that "[i]t just takes me forever to get up the stairs. Going down is not the problem. It's going up." (Tr. 37-38). When asked about her pain, Plaintiff described having "some days where it's just excruciating, where I have to just lay down [and] use my heating pad[.]" (Tr. 38). She claims the heating pad "really helps a lot." *Id.* On a scale of one to ten, Plaintiff rated her pain as "seven" on an average day–and then repeated "eight." When asked whether her pain goes up to a ten, Plaintiff replied: "Yes. It has gone to ten where I just had to stay in bed." *Id.*

When Plaintiff's attorney asked about side effects from her "several medications," Plaintiff said they make her "drowsy, very drowsy." *Id.* Plaintiff says she can watch "some TV" but that she does not watch TV often because she does not "care for it much." *Id.* Plaintiff stated that she does not read because it "hurts [her] to hold the book." (Tr. 38-39).

Upon reexamination Plaintiff, the ALJ asked about Plaintiff's seizures. (Tr. 39). Plaintiff stated that "Anderson, I think was his name. He told me I'd had, was having seizures. I would–This side of my face would droop. They thought I was having a stroke one day, and I just wasn't –Responding poor, can't think of the word I'm looking for." (Tr. 39). When the ALJ mentioned Plaintiff's "72 hour EEG that was normal", Plaintiff confirmed that she has not had

13

any more seizure-type activity. *Id.* Plaintiff further stated that she was not taking medication for the seizures and that "[t]hey had me on Prednisone and [Dr. Anderson] seemed to think that's what was setting it off." *Id.*

When asked if there was anything else she would like to say before the hearing closed, Plaintiff replied: "No. I'm sorry. I don't know what to say." *Id.* Likewise, Plaintiff's attorney declined to make a closing statement and the hearing was closed.

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff presents three errors for review. One, the ALJ erred by not giving controlling weight to the treating physicians' opinions. Two, the ALJ erred by not giving proper consideration to Plaintiff's severe impairments (asthma, obesity and migraine headaches), and by not providing a vocational expert ("VE") for testimony regarding non-exertional limitations. Three, the ALJ erred by determining that Plaintiff has the physical residual functional capacity to perform substantial gainful activity. (Docket Entry 12-1, p. 1-2).

A.    Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more

than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.    Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1.    If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.    If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.    If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[5] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4.    If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

---

[5] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

15

5.      Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In determining residual functional capacity (RFC) for purposes of the analyses required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

C.      The ALJ Did Not Err in Weighing the Opinions of Dr. Dallas and Dr. Watterson.

Plaintiff argues that the ALJ erred in refusing to give controlling weight to the opinions of Dr. Dallas and Dr. Watterson. (Docket Entry 12-1, p. 16-23).

An "ALJ 'will' give a treating source's opinion controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record.'" *Cole v. Astrue*, 652 F.3d 653, 661 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). If there is contrary medical evidence, however, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994). While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth "good reasons" for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the

16

opinion, the consistency of the opinion with the record as a whole, the specialization of the treating source and any other factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004). The Sixth Circuit "has made clear that '[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons[.]'" *Cole* 652 F.3d at 661 (6th Cir. 2011) (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)).

In this case, the ALJ properly explained why she did not afford controlling weight to the opinions of Dr. Dallas and Dr. Watterson. Citing the Medical Source Statements of Ability to Do Work-Related Activities the doctors filled out weeks apart, the ALJ reasoned that "the completely identical assessments [raise] questions of credibility." (Tr. 24, 281-89). The ALJ saw no evidence from either physician since August 2006 to support the limitations found in the May and June 2007 [Medical Source Statements]." (Tr. 24, 192-93). Going further, the ALJ pointed out that "based upon the medical evidence of record" Plaintiff had not even "seen either physician in more than eight months[.]" (Tr. 24). Even during the treatments periods, the ALJ points out that Plaintiff "did not see Dr. Dallas from September 2003 until October 2004" and that the record showed "no evidence of medical treatment from Dr. Watterson prior to 2005[.]" (Tr. 23).

As to non-treating sources, the ALJ "carefully considered all opinion evidence of record and has found the opinions of the consultative examiner and the State Agency program physicians to be the most credible and persuasive." *Id*. To that end, "the opinions of Dr. Watterson and Dr. Dallas are not given significant or controlling weight as the limitations and the finding of

17

disability is not supported by the medical evidence of record[.]" *Id*. In short, the Magistrate Judge is satisfied that the ALJ provides the necessary "good reasons" for not giving controlling weight to the two treating physicians.

D.    The ALJ Did Not Err in Considering Plaintiff's Impairments and Not Using a Vocational
      Expert's Testimony Regarding Nonexertional Limitations.

Plaintiff argues that the ALJ erred by failing to properly consider obesity, asthma and migraine headaches, and by failing to have a VE available to testify regarding nonexertional limitations. (Docket Entry 12-1, p. 12-16).

Obesity no longer qualifies as a "listed impairment," but Social Security Ruling 02-1p "intruct[s] adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." SSR 02-1p, 2000 WL 628049, at * 1. That said, the Sixth Circuit has called it a "a mischaracterization to suggest that [SSR 02-1p] offers any particular procedural mode of analysis for obese disability claimants." *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 412 (6th Cir. 2006)). Rather, SSR 02-1p "only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Id*.

As to obesity, the facts in this case are analogous to *Cranfield v. Comm'r of Soc. Sec.*, 79 F.Appx. 852, 857 (6th Cir. 2003), where the plaintiff's disability application did not reference obesity. The "ALJ did nothing more than *mention* [Plaintiff's] obesity" when neither the plaintiff nor her doctors offered any evidence to suggest that her weight was a significant impairment." *Id*. (emphasis added). The *Cranfield* court declared that, "since [the plaintiff's] claims did not indicate that obesity was a significant impairment, the ALJ was not required to give the issue any

*more* attention that he did." *Id*. (emphasis added). Similarly, in *Bledsoe*, the Sixth Circuit confirmed that the ALJ "did consider" plaintiff's obesity because "[f]irst, the ALJ made explicit mention of [plaintiff's] obesity in his finding of facts" and "[s]econd, the ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity." *Bledsoe*, 165 Fed.Appx. At 412 (citing *Skarbek v. Barnhart*, 290 F.3d 500, 504 (7th Cir. 2004)).

The ALJ in this case did make a specific mention of obesity in her findings of facts, contrary to the Plaintiff's assertion that the ALJ decision is totally silent in that regard. (Tr. 22; Docket Entry 12-1, p. 13). The ALJ references Exhibit 6F and lists "obesity" among Dr. Gomez's diagnoses. (Tr 22). Plaintiff did not mention her weight in the Disability Report dated October 6, 2006, or at the administrative hearing–as she only alleged limitations due to lupus, arthritis, fibromyalgia, back problems and seizures. (Tr. 119, 32-39). Likewise, Plaintiff's own treating physicians made no reference to her weight either. (Tr. 282-89). The only evidence of Plaintiff's obesity comes from Dr. Gomez and Dr. Moore–the very sources that the ALJ found most credible. (Tr. 268, 270). In light of *Cranfield* and *Bledsoe*, the Magistrate Judge believes that the ALJ gave Plaintiff's obesity proper consideration.

Similar facts surround Plaintiff's claims of asthma and migraine headaches. They, too, were left out of her Disability Report and testimony at the administrative hearing. (Tr. 119, 32-39). Additionally, Plaintiff's own treating physicians did not state that asthma or migraines caused work-related limitations; yet both symptoms were evaluated by sources whose opinions align with the ALJ's RFC finding. Dr. Gomez noted Plaintiff's history of "chronic headaches" and Dr. Moore considered migraines and asthma. (Tr. 265, 277). The ALJ herself noted that, while there was evidence of some treatment for headaches, it "fails to establish that headaches are

19

of the frequency and/or severity to establish a severe impairment[.]" (Tr. 21). Like obesity, the Magistrate Judge believes that the ALJ properly considered Plaintiff's asthma and migraines.

As a corollary allegation, Plaintiff contends that the ALJ erred in failing to obtain VE testimony regarding nonexertional limitations and instead relying on the Medical-Vocational Guidelines (the "Grid"). (Docket Entry 12-1, p. 15). The ALJ "may rely on the Grid to demonstrate the availability of appropriate jobs if a claimant's limitations are exertional, or if a claimant has nonexertional limitations that do not significantly limit his or her ability to perform a full range of work at a specific exertional level." *Pena v. Comm'r of Soc. Sec.*, No. 98-1833, 1999 WL 775832, at *4 (6th Cir. Sept. 24, 1999). Before concluding that the Grid will not be applied due to nonexertional limitations, "those limitations must be severe enough to restrict a full range of gainful employment at the designated level." *Collins v. Comm'r of Soc. Sec.*, 357 Fed. Appx. 663, 670 (6th Cir. 2009) (citations omitted). In short, the Sixth Circuit has held that "[i]f the nonexertional limitations were not significant, reliance on the Grid was appropriate."

In this case, the ALJ's use of the Grid was made with a full and proper description of how her considerations must comply with various Medical-Vocational Guidelines and the existence of any exertional and/or nonexertional limitations. (Tr. 25). In making her RFC finding, the ALJ "considered all symptoms" and did not state any restrictions due to nonexertional limitations. (Tr. 21). While Plaintiff contends that her severe impairments and obesity, asthma and migraines have "associated nonexertional limitations," the previous discussion in this section cites substantial evidence to support the ALJ's use of the Grid. Additionally, the ALJ noted the Plaintiff's allegations regarding seizures and found "no evidence of a medically determinable seizure impairment." (Tr. 21). The ALJ also discussed that: evidence of Plaintiff's pain is not of the

20

frequency and/or severity to preclude all work; Plaintiff has no significant neurological deficits; Plaintiff performs chores, cooking, laundry and driving; Plaintiff's 2006 MRI failed to show any surgical lesion, and her EMG/nerve studies were negative for neuropathy and radiculopathy; Plaintiff has not sought treatment for carpal tunnel; and Plaintiff's symptoms have not warranted surgical intervention or even conservative treatment. (Tr. 23). Relatedly, the ALJ credited the opinions of Dr. Gomez and Dr. Moore, which aligned with the ALJ's determination about Plaintiff's ability to perform a full range of light work. (Tr. 24).

In short, the Magistrate Judge believes that the ALJ did not err in considering Plaintiff's limitations and using the Medical-Vocational Guidelines.

E.     The ALJ Did Not Err in Assessing Plaintiff's Residual Functional Capacity

Plaintiff lastly presents an argument, explained in a single paragraph, "that her [RFC] is actually less than sedentary and as such a finding of disabled is directed[.]" (Docket Entry 12-1, p. 13). In support, Plaintiff generally cites the opinions of her treating physicians.

In consideration of aforementioned discussion (*supra* III.D and III.E), the Magistrate Judge believes that the ALJ cited substantial evidence in support of her RFC conclusion. In short, the ALJ properly found support in the evidence provided by Dr. Gomez and Dr. Moore and provided "good reasons" for discounting the treating physicians reports; properly evaluated Plaintiff's testimony and credibility; and otherwise comprehensively analyzed the medical evidence of record. (Tr. 21-25).

## IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **DENIED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 27nd day of December, 2011.

 /S/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge